Slip Op. 18-66

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TOSÇELIK PROFIL VE SAC ENDÜSTRISI A.Ş.,**  Plaintiff, | |
| v. | |
| **UNITED STATES,** | Before: Jennifer Choe-Groves, Judge |
| Defendant, | Consol. Court No. 17-00018 |
| and | |
| **ZEKELMAN INDUSTRIES,** | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the 2014–2015 administrative review of the antidumping duty order on welded carbon steel standard pipe and tube products from Turkey.]

Dated: June 6, 2018

David L. Simon, Law Office of David L. Simon, of Washington, D.C., argued for Plaintiff Tosçelik Profil ve Sac Endüstrisi A.Ş.

Elizabeth A. Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Catherine D. Miller, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Christopher T. Cloutier, Schagrin Associates, of Washington, D.C., argued for Consolidated Plaintiff and Defendant-Intervenor Zekelman Industries. With him on brief were Paul W. Jameson and Roger B. Schagrin. Of counsel were Elizabeth J. Drake and John W. Bohn.

      Choe-Groves, Judge:  This case involves corrosion-resistant steel products from Turkey. Plaintiff Tosçelik Profil ve Sac Endüstrisi A.Ş. ("Plaintiff" or "Tosçelik") and Consolidated Plaintiff and Defendant-Intervenor Zekelman Industries ("Zekelman") bring this action contesting the final results of the administrative review of welded carbon steel standard pipe and tube products from Turkey, in which the U.S. Department of Commerce ("Commerce" or "Department") found that the products at issue are being, or are likely to be, sold in the United States at less-than-fair value.  See <u>Welded Carbon Steel Standard Pipe and Tube Products From Turkey</u>, 81 Fed. Reg. 92,785 (Dep't Commerce Dec. 20, 2016) (final results of administrative review; 2014–2015), <u>as amended</u>, 82 Fed. Reg. 11,002 (Dep't Commerce Feb. 17, 2017) (amended final results of antidumping duty administrative review; 2014–2015) (collectively, "<u>Final Results</u>"); see also Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey, A-489-501, (Dec. 12, 2016), <u>available at</u> https://enforcement.trade.gov/frn/summary/turkey/2016-30541-1.pdf (last visited May 29, 2018) ("Final I&D Memo").  This matter is before the court on Rule 56.2 motions for judgment on the agency record filed by Tosçelik and Zekelman challenging various aspects of the Department's antidumping duty order.  For the reasons discussed below, the court concludes that (1) Commerce's decision to calculate Tosçelik's duty drawback adjustment by allocating total exemptions over total cost of production is not in accordance with the law, (2) Commerce's decision to grant Tosçelik a circumstance of sale adjustment for warehousing expenses is not supported by substantial evidence, and (3) Commerce's decision to use actual weight instead of theoretical weight is supported by substantial evidence.

## BACKGROUND

Commerce commenced an administrative review of the antidumping duty order on welded carbon steel standard pipe and tube products from Turkey at the request of domestic standard pipe producers, including JMC Steel Group ("JMC"), on July 1, 2015.[1] See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 80 Fed. Reg. 37,588 (Dep't Commerce July 1, 2015) (notice of initiation of administrative review) ("Initiation Notice"); see also Letter from Schagrin Associates to Department of Commerce, PD 2, bar code 3280221-01 (May 29, 2015); Letter from Schagrin Associates to Department of Commerce, PD 4, bar code 3280623-01 (June 1, 2015). Commerce found that it would be impractical to examine all importers and producers, and therefore opted to examine companies accounting for the largest volume of the subject merchandise from Turkey during the investigation period. See Initiation Notice, 80 Fed. Reg. at 37,588. Tosçelik was one of the selected companies. See id. at 37,593.

Commerce published its preliminary results on June 13, 2016. See Welded Carbon Steel Standard Pipe and Tube Products From Turkey, 81 Fed. Reg. 38,131 (Dep't Commerce June 13, 2016) (preliminary results of antidumping duty administrative review, and partial rescission of review; 2014–2015) ("Preliminary Results"); see also Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2014–2015 Administrative Review, A-489-501, (June 6, 2016), available at https://enforcement.trade.gov/frn/summary/turkey/2016-13968-1.pdf (last visited

---

[1] Zekelman Industries was formerly known as JMC Steel Group. See Mot. Zekelman Industries J. Agency R. USCIT Rule 56.2 1, n.1, July 10, 2017, ECF No. 24; Letter from Schagrin Associates to Department of Commerce, PD 197, bar code 3537393-01 (Jan. 18, 2017). All references to JMC throughout the underlying administrative proceeding are to Zekelman.

May 29, 2018) ("Preliminary I&D Memo"). Pursuant to the Department's differential pricing analysis, Commerce used the average-to-average methodology to calculate dumping margins for both mandatory respondents. See Preliminary I&D Memo at 5–8. It assigned a 0.96 percent weighted-average dumping margin for Tosçelik. Preliminary Results, 81 Fed Reg. at 38,133. The Department preliminarily granted a duty drawback adjustment to Tosçelik due to the company's participation in Turkey's Inward Processing Regime. See Preliminary I&D Memo at 10. Commerce also preliminarily granted a circumstance of sale adjustment to Tosçelik. See id. at 14.

Following the preliminary determination, JMC filed an administrative case brief on July 27, 2016. See Administrative Case Brief of JMC Steel Group, PD 172, bar code 3491484-01 (July 27, 2016). JMC contested the Department's grant of a circumstance of sale adjustment to Tosçelik for warehousing expenses, as well as the Department's decision to use actual weight as opposed to theoretical weight for calculating the dumping margin. See id. at vi. Tosçelik submitted a rebuttal brief on August 9, 2016, which contested, in part, Commerce's methodology in calculating the duty drawback adjustment. See Tosçelik Rebuttal Brief at 6–28, PD 174, bar code 3495971-01 (Aug. 6, 2016).

Commerce issued its final determination on December 20, 2016. See Welded Carbon Steel Standard Pipe and Tube Products From Turkey, 81 Fed. Reg. 92,785 (Dep't Commerce Dec. 20, 2016) (final results of administrative review; 2014–2015). The Department assigned a weighted-average dumping margin of 1.91 percent to Tosçelik for the period of May 1, 2014 through April 30, 2015. Id. at 92,786. JMC subsequently submitted a ministerial error allegation. See Letter from Schagrin Associates to Department of Commerce, PD 188, bar code

3532690-01 (Dec. 27, 2016). Tosçelik filed comments in rebuttal to JMC's submission. See Letter from Law Offices of David L. Simon to Department of Commerce, PD 189, bar code 3533504-01 (Jan. 3, 2017). Commerce issued amended final results on February 17, 2017, in which it calculated a final weighted-average dumping margin of 3.40 percent for Tosçelik. See Welded Carbon Steel Standard Pipe and Tube Products From Turkey, 82 Fed. Reg. 11,002, 11,003 (Dep't Commerce Feb. 17, 2017) (amended final results of antidumping duty administrative review; 2014–2015).

Tosçelik commenced this action contesting Commerce's Final Determination on January 18, 2017, ECF No. 1, and filed its complaint on February 16, 2017, ECF No. 7. The court consolidated this action with Zekelman Industries v. United States on May 3, 2017. See Order, May 3, 2017, ECF No. 21.

Zekelman submitted a Rule 56.2 motion for judgment on the agency record, challenging Commerce's use of actual weight in calculating the weighted-average dumping margin and Commerce's grant of a circumstance of sale adjustment to Tosçelik for warehousing expenses. See Mot. Zekelman Industries J. Agency R. USCIT Rule 56.2, July 10, 2017, ECF No. 24 ("Zekelman's Mot."). Tosçelik filed a timely response. See Resp. Br. Pl. Tosçelik Profil ve Sac Endüstrisi A.Ş., Oct. 30, 2017, ECF No. 36. Zekelman filed a reply. See Consolidated Pl. Zekelman Industries' Reply Br. Supp. Mot. J. Agency R. Pursuant Rule 56.2, Nov. 29, 2017, ECF No. 43 ("Zekelman's Reply").

Tosçelik also filed a Rule 56.2 motion for judgment on the agency record, contesting the methodology Commerce utilized to calculate the amount of the duty drawback adjustment. See Mot. Pl. Tosçelik Profil ve Sac Endüstrisi A.Ş. J. Agency R. Pursuant Rule 56.2, July 10, 2017,

Consol. Court No. 17-00018                                                                                               Page 6

ECF No. 25; see also Mem. Supp. Mot. Pl. Tosçelik Profil ve Sac Endüstrisi A.Ş. J. Agency R. Pursuant Rule 56.2, July 10, 2017, ECF No. 27 ("Pl.'s Mot."). Zekelman filed a response. See Def.-Intervenor Zekelman Industries' Resp. Pl.'s Mot. J Agency R., Oct. 30, 2017, ECF No. 38. Tosçelik filed a timely reply. See Reply Br. Pl. Tosçelik Profil ve Sac Endüstrisi A.Ş., Nov. 29, 2017, ECF No. 40.

Defendant submitted a consolidated response to both motions. See Def.'s Consolidated Resp. Opp'n Pl.'s & Consolidated Pl.'s Mots. J. Agency R., Oct. 30, 2017, ECF No. 39 ("Def.'s Br."). Pursuant to the two motions for judgment on the agency record, this court held oral argument on March 20, 2018. See Oral Argument, Mar. 20, 2018, ECF No. 55.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final determination in an antidumping duty investigation.[2] The court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.   Tosçelik's Rule 56.2 Motion for Judgment on the Agency Record**

    **A.  Legal Standard for Duty Drawback Adjustment**

The Tariff Act of 1930, as amended, directs Commerce to conduct antidumping duty investigations and determine whether goods are being sold at less-than-fair value. See 19 U.S.C.

---

[2] All citations to the U.S. Code are to the 2012 edition. All further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code.

§ 1673. If the Department finds that subject merchandise is being sold at less-than-fair value, and the U.S. International Trade Commission finds that these less-than-fair value imports materially injure a domestic industry, the Department issues an antidumping duty order imposing antidumping duties equivalent to "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." Id. The Tariff Act defines export price as the price at which the subject merchandise is first sold in the United States, whereas the normal value represents the price at which the subject merchandise is sold in the exporting country.[3] See id. §§ 1677a(a), 1677b(a)(1)(B). The statute provides further guidance for determining export price as follows:

> (c) Adjustments for export price and constructed export price
> The price used to establish export price and constructed export price shall be--
>> (1) increased by--
>>> (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States.

Id. § 1677a(c)(1)(B). This calculation is known as a duty drawback adjustment.

The purpose of a duty drawback adjustment is to ensure a fair comparison between normal value and export price. See Saha Thai Steel Pipe (Public) Co. Ltd. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011); Torrington Co. v. United States, 68 F.3d 1347, 1352–53 (Fed. Cir. 1995). Under a duty drawback program, a producer may receive an exemption or rebate from their home government for duties on imported inputs used to produce merchandise that is

---

[3] Constructed export price is "the price at which the subject merchandise is first sold . . . in the United States . . . to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b). For readability purposes, all discussion of export price in this opinion will also encompass constructed export price.

subsequently exported to the U.S. See Saha Thai, 635 F.3d at 1338. As a result, producers are still required to pay import duties for domestically-sold goods, which leads to an increase in normal value. See id. A duty drawback adjustment "corrects this imbalance, which could otherwise lead to an inaccurately high dumping margin, by increasing [export price] to the level it likely would be absent the duty drawback." Id.; see also S. Rep. No. 67-16, at 12 (1921).

Commerce applies a two-pronged test to determine whether a producer qualifies for a duty drawback adjustment. See Saha Thai, 635 F.3d at 1340. The respondent company must show "(1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise." Id.

### B. Commerce's Methodology for Calculating the Duty Drawback Adjustment

Commerce awarded Tosçelik a duty drawback adjustment due to the company's participation in Turkey's Inward Processing Regime. See Preliminary I&D Memo at 10. Tosçelik described the duty drawback scheme in the administrative proceedings as follows:

> Under Turkey's "Inward Processing Regime" (IPR), a company that imports raw materials and exports finished goods made from such raw materials may obtain an inward processing certificate (Turkish acronym, DIIB). A DIIB sets forth the quantity of raw material allowed to be imported without deposit of import duties under a given DIIB and the quantity of export required to close the DIIB, i.e., to satisfy the export commitment requirements of the DIIB. When a DIIB has been closed, and the closure is approved by Turkish customs, then the DIIB holder is released of any liability for import duties otherwise payable on the entries under the DIIB. The final approval of DIIB closures is within the jurisdiction of the Turkish Foreign Trade ministry; the process is generally completed 3 to 4 years after submission of a closed DIIB for approval.
>
> When a Turkish company imports or exports goods, it files an entry or exit declaration, respectively, with Turkish Customs. Customs verifies the accuracy of such import and export declarations and inserts the finalized quantities, values, and related

information, including DIIB numbers, into a Customs database. A holder of a DIIB can then query the Turkish Customs database, via an internet e-portal, to ascertain the import and export movements under its DIIBs. DIIB holders can also download their DIIB usage tables from the Customs e-portal.

Section B–D Questionnaire Response of Tosçelik Profil ve Sac Endüstrisi A.Ş. at 29, PD 75–76, bar code 3400035-01 (Sept. 28, 2015). Both Plaintiff and Defendant agree that the duty drawback adjustment was properly granted here. The issue in dispute is whether Commerce reasonably calculated the duty drawback adjustment for Tosçelik.

The Department made its calculation by reducing the duty drawback adjustment to Tosçelik's U.S. sales and allocating the duty exemptions and rebates claimed over the total quantity of production using that input. See Def.'s Br. 12–13. Defendant describes the calculation used by Commerce in the following equation:

$$\frac{\text{Input cost} + \text{rebated or forgiven duties}}{\text{Quantity of all production using that input}} = \text{Per unit cost of the input, including its duty burden}$$

Id. at 13. Tosçelik argues that the Department's calculation is inconsistent with the statute and the agency's practice of computing exempted and rebated duties over total exports to the U.S. See Pl.'s Mot. 17, 19. Because the statute contemplates a drawback on duties that are rebated or exempted "by reason of" the exportation of the subject merchandise to the United States, Tosçelik contends that Commerce's calculation of the duty drawback adjustment is contrary to the statute's plain language in that the chosen methodology ignores the statute's textual linkage between the adjustment and the act of exporting. See id. at 19. For the following reasons, the court finds that Commerce calculated the amount of duty drawback adjustment not in accordance with the law.

Under its previous practice, Commerce divided the amount rebated or forgiven by the exported quantity to determine the duty burden borne by each unit of merchandise sold in the United States. See Def.'s Br. 13. This "per unit" amount was then added to the export price. See id. Commerce changed its practice in this case, and employed a "duty neutral" approach when calculating Tosçelik's duty drawback adjustment. See Final I&D Memo at 5. Commerce stated that it

> continue[d] to find in these final results that where duty drawback inputs are sourced from both domestic (Turkish) and foreign [Non-Turkish] sources, a calculation of duty drawback which is based on export volume results in an imbalance in the comparison of export price (EP) or constructed export price (CEP) with NV [normal value]. . . . [T]his imbalance exists because the NV portion of the comparison reflects an average annual cost that reflects both foreign sourced inputs (which incur duties) and domestic inputs for which the Respondent incurs no duties. In contrast, on the EP/CEP side, the duty drawback adjustment to the USP [U.S. Price] employs a smaller denominator than that used on the NV side. As in *Rebar Trade*, we maintain that the combination of duties included within NV relative to what is included within USP, results in a larger per-unit U.S. sales adjustment than is imbedded within NV. This creates an imbalance in the comparison of the USP to NV.

Id. (footnotes omitted). As a result of these findings, the Department "based [its] duty drawback calculation on the per-unit costs" within the cost of production database submitted by Tosçelik. Id. at 6.

Defendant contends that Commerce's methodology is consistent with precedent, specifically Saha Thai. See Def.'s Br. 15. Defendant argues that the "matching principle" illustrated in Saha Thai instructs Commerce that export price, cost of production, and constructed value "should all be increased together, or not at all." Id. at 19 (citing Saha Thai, 635 F.3d at 1342–43). The court disagrees with Defendant's reading of the case. The duty drawback regime at issue in Saha Thai was one based solely on exemptions. Because the duties in Saha Thai were

exempted, they were not recorded in the respondent company's books as an expense incurred. Commerce therefore increased the company's cost of production ("COP") and constructed value ("CV"), which are both part of the Department's normal value calculation, to account for the duties presumably paid on inputs for products sold in the domestic market. The Court of Appeals for the Federal Circuit recognized that:

> [T]he entire purpose of increasing EP is to account for the fact that the import duty costs are reflected in NV (home market sales prices) but not in EP (sales prices in the United States). An import duty exemption granted only for exported merchandise has no effect on home market sales prices, so the duty exemption should have no effect on NV. Thus, because COP and CV are used in the NV calculation, COP and CV should be calculated as if there had been no import duty exemption. It would be illogical to increase EP to account for import duties that are purportedly reflected in NV, while simultaneously calculating NV based on a COP and CV that do not reflect those import duties. Under the "matching principle," EP, COP, and CV should be increased together, or not at all.

Saha Thai, 635 F.3d at 1342–43. Because Commerce adjusted EP in the Saha Thai case to account for the duty drawback adjustment received by the respondent company, the Court of Appeals for the Federal Circuit concluded that the subsequent adjustment to NV to reflect the duties paid on inputs for products sold in the home market was proper. The "matching principle" relates, therefore, to an adjustment to normal value with respect to the particular facts and recordkeeping practices presented in Saha Thai, and should not be expanded to encompass all duty drawback adjustment calculations made by Commerce. Here, the Parties do not allege deficiencies in Tosçelik's recordkeeping or in the normal value calculation with respect to duty drawback to warrant application of the matching principle. When viewed in this context, Saha Thai's matching principle does not support Commerce's methodology in the instant matter before this court.

Defendant argues further that Commerce's methodology is permitted under 19 U.S.C. § 1677a(c)(1)(B). See Def.'s Br. 15. The statute allows for an upward adjustment to EP by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B). Commerce's calculation in this case is inconsistent with the statute because allocating duty drawback to total production encompasses home market (Turkish) sales, which could not earn a duty drawback, and fails to adequately connect the adjustment to duties forgiven "by reason of" the products' exportation to the United States. By including costs associated with manufacturing goods sold in the domestic market, the Department's methodology lessens the upwards adjustment and conceptually reintroduces an imbalance in the dumping margin calculation. Commerce's method of calculating Tosçelik's duty drawback adjustment with respect to total production is inconsistent with and contravenes the plain language of 19 U.S.C. § 1677a(c)(1)(B). The court rejects Defendant's argument and concludes that Commerce's action is unreasonable and is not in accordance with the law, and remands Commerce's determination for further administrative proceedings consistent with this opinion.

**II.     Zekelman's Rule 56.2 Motion for Judgment on the Agency Record**

**A. Commerce's Use of Actual Weight as Opposed to Theoretical Weight**

When calculating Tosçelik's antidumping margin, Commerce utilized actual weight as opposed to theoretical weight, which is an estimated weight based on the products' dimensions. See Final I&D Memo at 19. Zekelman argues that Commerce should have either requested that Tosçelik provide information on the basis of theoretical weight or converted Tosçelik's

information into theoretical weight. See Zekelman's Mot. 12–16. Zekelman further contends that Commerce's failure to explain why it did not take either action alone warrants a remand on this issue. See id. at 16.

      Contrary to Zekelman's arguments, the record supports the Department's decision. Commerce's questionnaire did not specify whether respondents should provide information in either actual or theoretical weight, but rather that respondents should use the "same unit of measure" to report sales. See Section B–D Questionnaire Response of Tosçelik Profil ve Sac Endüstrisi A.Ş. at 61, PD 75–76, bar code 3400035-01 (Sept. 28, 2015). Tosçelik prepared all databases for the Department on an actual-weight basis. See id. at 62. In its supplemental questionnaire response, Tosçelik explained to the Department its belief that the use of theoretical weight in this case may introduce unwanted distortions into the calculations. See Supplemental Questionnaire Response of Tosçelik Profil ve Sac Endüstrisi A.Ş. at 5–7, PD 115, bar code 3546873-01 (Mar. 28, 2016). Although Commerce recognized that it may consider utilizing only theoretical weight in future reviews, it explained that it would continue to use actual weight in the instant review because the respondent provided data in actual weight and had done so in previous administrative reviews. See Final I&D Memo at 19. Based on the information available in the record, it was reasonable for Commerce to calculate Tosçelik's antidumping margin on an actual-weight basis. The court concludes that the Department's decision to calculate Tosçelik's antidumping margin on an actual-weight basis is supported by substantial evidence.

Consol. Court No. 17-00018                                                                                          Page 14

### B. Commerce's Grant of a Circumstance of Sale Adjustment for Warehousing Expenses to Tosçelik

Commerce granted Tosçelik a circumstance of sale adjustment for Tosçelik's warehousing expenses. Zekelman argues that Commerce's decision was unsupported by substantial evidence because Commerce failed to address contrary evidence on the record allegedly showing that Tosçelik overstated its warehousing expenses in its questionnaire responses. See Zekelman's Mot. 16–20. Zekelman contends further that Tosçelik's refusal to provide information relating to its warehousing expenses should have prompted the Department to apply facts otherwise available with an adverse inference under 19 U.S.C. § 1677e. See id. at 18–20. Zekelman requests that the court remand this issue so the Department can conduct a proper analysis. See Zekelman's Reply 5. The Government defends Commerce's grant of an adjustment. See Def.'s Br. 25–27. For the following reasons, the court concludes that Commerce's decision to grant Tosçelik an adjustment for warehousing expenses was unsupported by substantial evidence.

As stated before, in an antidumping duty calculation, normal value represents the price at which the subject merchandise is sold in the exporting country. See 19 U.S.C. § 1677b(a)(1)(A). When determining the appropriate price for comparison, Commerce may make certain price adjustments. See id. § 1677b(a)(6). The price may be

> (C) increased or decreased by the amount of any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise provided under this section) that is established to the satisfaction of the administering authority to be wholly or partly due to--
> 
>   (iii) other differences in the circumstances of sale.

Id. § 1677b(a)(6)(C)(iii).

Section 776 of the Tariff Act provides that if "necessary information is not available on the record" or if a respondent "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," then the agency shall "use the facts otherwise available in reaching" its determination. Id. §§ 1677e(a)(1), (a)(2)(B). If the Department further finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from the agency, then the Department "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1)(A). The Court of Appeals of the Federal Circuit has interpreted these two subsections to have different purposes. See Mueller Comercial de Mexico, S. de R.K. De C.V. v. United States, 753 F.3d 1227, 1232 (Fed. Cir. 2014). Subsection (a) applies "whether or not any party has failed to cooperate fully with the agency in its inquiry." Id. (citing Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011)). On the other hand, subsection (b) applies only when the Department makes a separate determination that the respondent failed to cooperate "by not acting to the best of its ability." Id. (quoting Nippon Steel v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

The law clearly requires Commerce to explain the basis for its decisions. See, e.g., NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009) ("[W]hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."). With respect to antidumping duties cases specifically, "a final determination by Commerce must include 'an explanation of the basis for its determination

that addresses relevant arguments[] made by interested parties who are parties to the investigation or review.'" Id. at 1320 (quoting 19 U.S.C. § 1677f(i)(3)(A)).

Tosçelik indicated in its questionnaire response that the company owns and operates two steel service centers. See Section B–D Questionnaire Response of Tosçelik Profil ve Sac Endüstrisi A.Ş. at 29, PD 75–76, bar code 3400035-01 (Sept. 28, 2015). "The main function of these service centers is to provide cut-to-length (CTL) services for conversion of coils to sheets. However, Tosçelik also uses these service centers for warehousing pipes for delivery to customers in the vicinity of the service centers. Tosçelik books all the expenses of these service centers in the respective cost center for each location." Id. The company provided worksheets demonstrating the costs of operating each warehouse. See Exhibit 4 of Section B–D Questionnaire Response of Tosçelik Profil ve Sac Endüstrisi A.Ş., CD 62–64, bar code 3400032-01 (Sept. 28, 2015). Commerce issued a supplemental questionnaire, asking the respondent to "re-calculate [its] claimed warehousing expenses," ensuring "that all expenses incurred in [its] warehousing claim are directly related to warehousing functions." Supplemental Questionnaire Response of Tosçelik Profil ve Sac Endüstrisi A.Ş. at 13, PD 115, bar code 3452802-01 (Mar. 28, 2016). Tosçelik responded that because each location is "a single cost center, it is not possible to separate the warehousing expense from the other expenses of the operations." Id. The company resubmitted its worksheets after removing the "one expense in the warehouse that is solely attributable to the CTL activities carried out . . . namely, the scrap generated." Id. at 14.

Commerce's preliminary determination simply stated that the Department made adjustments for differences in circumstances of sale by "deducting direct selling expenses incurred on home market sales and adding U.S. direct selling expenses to [normal value]."

Preliminary I&D Memo at 14–15. "Direct selling expenses consisted of credit expenses, warranty expenses, and factoring expenses." Id. at 15. The preliminary determination made no mention of Tosçelik's warehousing expenses.

Commerce's final determination briefly responded to comments concerned with Tosçelik's warehousing expenses. That section reads, in full:

> We agree with Toscelik. In the *Preliminary Results*, we made a circumstances of sale adjustment for Toscelik's reported warehousing expenses, in accordance with section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410.
>
> In reviewing Toscelik's reported warehousing expenses, we find no evidence suggesting that Toscelik's claimed expenses relate to activities other than warehousing, or that Toscelik's reported warehousing expenses are overstated. Therefore, in these final results, pursuant to section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410, we have made no changes from our *Preliminary Results*, and we have continued to make a circumstances of sale adjustment for Toscelik's warehousing expenses.

Final I&D Memo at 22 (footnotes omitted). The Department's proclamation of "no evidence" clearly contradicts Tosçelik's admission that the claimed warehousing expenses encompassed costs associated with both manufacturing and storing products for sale. The Department failed to give reasons and substantiate its decision to make a circumstance of sales adjustment for Tosçelik. Accordingly, the court remands Commerce's final determination on this issue. On remand, Commerce should adequately address contrary evidence on the record and provide clear and discernable reasons for its decision.

## CONCLUSION

For the foregoing reasons, the court concludes that Commerce impermissibly calculated Tosçelik's duty drawback adjustment, and that Commerce's methodology was not in accordance with the law. Tosçelik's Rule 56.2 motion for judgment upon the agency record is granted. On

remand, the Department should recalculate Tosçelik's duty drawback adjustment using a methodology that is consistent with this opinion.

The court concludes further that Commerce's decision to grant Tosçelik a circumstance of sale adjustment for warehousing expenses is not supported by substantial evidence, but upholds Commerce's use of actual weight as opposed to theoretical weight when calculating Tosçelik's weighted-average dumping margin as supported by substantial evidence. Zekelman's Rule 56.2 motion for judgment upon the agency record is granted with respect to the issue of circumstances of sale adjustment and denied with respect to the issue of actual weight. On remand, Commerce should reexamine the circumstance of sale adjustment granted to Tosçelik consistent with this opinion.

Accordingly, it is hereby

**ORDERED** that Tosçelik's Rule 56.2 motion for judgment on the agency record is granted; and it is further

**ORDERED** that Zekelman's Rule 56.2 motion for judgment on the agency record is granted in part with respect to the Commerce's grant of a circumstance of sale adjustment for warehousing expenses to Tosçelik; and it is further

**ORDERED** that Zekelman's Rule 56.2 motion for judgment on the agency record is denied in part with respect to Commerce's use of actual weight when calculating Tosçelik's weighted-average dumping margin; and it is further

**ORDERED** that the Final Results are remanded to the U.S. Department of Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that the U.S. Department of Commerce shall file its remand redetermination on or before September 4, 2018; and it is further

**ORDERED** that the U.S. Department of Commerce shall file the administrative record on or before September 18, 2018; and it is further

**ORDERED** that the Parties shall file any comments on the remand redetermination on or before October 4, 2018; and it is further

**ORDERED** that the Parties shall file any replies to the comments on or before November 5, 2018; and it is further

**ORDERED** that the joint appendix shall be filed on or before November 13, 2018.

                                                    /s/   Jennifer Choe-Groves
                                                    Jennifer Choe-Groves, Judge

Dated:     June 6, 2018
           New York, New York